Lumbee Enter. Dev. Inc., LLC v. Lumbee Reg'l Dev. Ass'n, 2020 NCBC 38.

STATE OF NORTH CAROLINA

ROBESON COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 2598

LUMBEE ENTERPRISE
DEVELOPMENT, INC.,

        Petitioner,

v.

LUMBEE REGIONAL
DEVELOPMENT ASSOCIATION
INCORPORATED; and LUMBEE
COMMUNITY DEVELOPMENT
CORPORATION,

        Respondents.

**ORDER AND OPINION ON
PETITIONER'S MOTION FOR
SUMMARY JUDGMENT**

THIS MATTER is before the Court upon Petitioner Lumbee Enterprise Development, Inc.'s ("LED") Motion for Summary Judgment. ("Motion," ECF No. 110.)

THE COURT, having considered the Motion, the briefs filed in support of and in opposition to the Motion, the evidentiary materials filed by the parties, the arguments of counsel at the hearing on the Motion, and other appropriate matters of record, concludes that the Motion should be GRANTED, in part, with regard to Lumbee Revitalization and Community Development Corporation, Inc.'s ("LCDC") counterclaim for conversion, and DENIED, in part, and that summary judgment should be GRANTED in favor of Respondents on LED's claims for declaratory relief, for the reasons and in the manner set forth below.

*Player McLean, LLP, by Lonnie M. Player, Jr. and James A. McLean for Lumbee Enterprise Development, Inc.*

*Marshall, Williams & Gorham LLP, by John L. Coble for Lumbee Regional Development Association Incorporated.*

*Ray Law Firm, PLLC, by Steven James O'Connor for Lumbee Community Development Corporation.*

McGuire, Judge.

## I.    FACTS AND PROCEDURAL BACKGROUND

1.    "The Court does not make findings of fact when ruling upon a motion for summary judgment.  But[,] to provide context for its ruling, the Court may state either those facts that it believes are not in material dispute or those facts on which a material dispute forecloses summary adjudication." *Ehmann v. Medflow, Inc.*, 2017 NCBC LEXIS 88, at *6 (N.C. Super. Ct. Sept. 26, 2017).

2.    Petitioner LED is a for-profit North Carolina corporation with its principal place of business in Robeson County, North Carolina.  At the time the Petition was filed in this action, LED was certified as an 8(a) Program participant under the United States Small Business Administration ("SBA") as a small, historically disadvantaged business.  (Petition, ECF No. 5, at ¶ 5.)

3.    Respondent Lumbee Regional Development Association, Inc. ("LRDA") is a North Carolina nonprofit organization established in 1968 "to provide services for the Lumbee Indian communities."  ("LRDA Bylaws," ECF No. 106 at Ex.1, p. iv.) LRDA is controlled by a Board of Directors (the "LRDA Board").  (ECF No. 106 at Ex.1, Art. II § 1.)  The LRDA Board is authorized to oversee an enumerated list of projects that benefit the community.  When the LRDA Board engages in an enumerated project, it has "authority to appoint a general governing Board of Directors of up to 10 members to govern any or all . . . projects.  Said Board of

Directors [appointed by the LRDA Board for a given project] shall serve at the pleasure of the LRDA Board of Directors." (ECF No. 106 at Ex.1, Art. II § 6.)

4. In the fall of 2001, during an LRDA Board meeting, board members James Hardin ("Hardin") and Larry Long proposed the "establishment of a Subsidiary Non-Profit Community Development Corporation (CDC)." (LRDA Sept. 29, 2001 Meeting Minutes, ECF No. 116 at Ex. 2.) In January 2002, LRDA formed LCDC as a North Carolina nonprofit corporation (LCDC Art. Inc., ECF No. 116, at Ex. 3, "[t]o create, facilitate and build the capacity of sustainable rural non-profits and for profit businesses which provide job producing entities." ("LCDC Bylaws," ECF No. 116 at Ex. 1, Ex. 2, Art. II.) LCDC "has operated as a Community Development Corporation (CDC) since 2003 when it received its first grant" pursuant to the provisions of 42 U.S.C. § 9805.[1] ("8(a) Application Narrative," ECF No. 5, at Ex. A.)

5. Pursuant to the LCDC Bylaws, the LRDA Board appoints three members to the LCDC's Board of Directors (the "LCDC Board"). Those appointed

---

[1] 42 U.S.C. § 9805 provides as follows: "The purpose of this part [42 USCS §§ 9805 et seq.] is to establish special programs of assistance to nonprofit private locally initiated community development corporations which (1) are directed to the solution of the critical problems existing in particular communities or neighborhoods (defined without regard to political or other subdivisions or boundaries) within those urban and rural areas having concentrations or substantial numbers of low-income persons; (2) are of sufficient size, scope, and duration to have an appreciable impact in such communities, neighborhoods, and rural areas in arresting tendencies toward dependency, chronic unemployment, and community deterioration; (3) hold forth the prospect of continuing to have such impact after the termination of financial assistance under this part [42 USCS §§ 9805 et seq.]; and (4) provide financial and other assistance to start, expand, or locate enterprises in or near the area to be served so as to provide employment and ownership opportunities for residents of such areas, including those who are disadvantaged in the labor market because of their limited speaking, reading, and writing abilities in the English language."

members appoint two additional members. (ECF No. 116 at Ex. 1, Ex. 2, Art. III, § III.) If the LCDC Board determines that "additional board members are needed, then the LRDA Board [ ] will appoint one or more members and the LCDC [Board] will appoint one or more members." (*Id.*) Each LCDC Board member is appointed to serve a three-year term. (*Id.* at Art. III, § IV.) However, upon the concurrence of a two-thirds majority vote of the LCDC Board, an LCDC director may be removed for cause. (*Id.* at Art. III, § VI.)

6.     Given LRDA's authority to elect members to the LCDC Board, there is naturally some commonality among members of the LRDA Board and LCDC Board. For example, Woodrow Dial ("Dial") was concurrently the chairman of the LRDA Board and the chairman of the LCDC Board. (Dial Dep., ECF No. 116 at Ex. 1, pp. 8, 20–21.) Additionally, Hardin testified that while LRDA cannot tell LCDC what to do, LRDA holds three seats on the LCDC Board, and those three seats are occupied by members of the LRDA Board. (Hardin Dep., ECF No. 111 at Ex. 4, pp. 69–70.)

7.     The LCDC Bylaws also permit LCDC to become a shareholder in a for-profit entity. (ECF No. 116 at Ex. 1, Ex. 2, Art. VII, § I.) The LCDC Bylaws, as initially written, stated that "subject to the concurrence of the related for profit's Board of Directors" LCDC will be responsible for selecting and appointing the "Board of Directors to any such related for profit Corporation." (*Id.* at Art. VII, § II.)

8.     In January 2008, LED was formed as a for-profit North Carolina corporation. (LED Art. Inc., ECF No. 116 at Ex. 5.) LRDA assisted in the formation of LED, "providing technical assistance and any other assistance that [it] could . . . to

create LED." (Dial Dep., ECF No. 116 at Ex. 1, pp. 21–22.) Despite LRDA's role in forming LED, LCDC is the sole shareholder of LED. ("LED Bylaws," ECF No. 34 at Ex. C, Art. I, § 4; Dial Dep., ECF No. 111 at Ex. 3, p. 31.) LCDC exercises its rights as the sole shareholder of LED, by and through, three shareholder representatives ("LED Shareholder Representatives") appointed by LCDC. (ECF No. 34 at Ex. C, Art. 1, § 4.) For some period of time, in addition to serving on both the LRDA and LCDC Boards, Dial also served as an LED Shareholder Representative on behalf of LCDC. (Dial Dep., ECF No. 116 at Ex.1, p. 21.)

9. The LCDC Board selected LED's initial Board of Directors ("LED Board"). (ECF No. 34 at Ex. C, at Art. III, § 2.) Thereafter, the LED Board is re-appointed or new members are added by the LED Shareholder Representatives at the annual LED shareholder meeting. (*Id.*)

10. In 2012, with the help of funding from LRDA, LED applied for and was accepted into, the SBA's 8(a) certification program (the "8(a) Program"). (Dial Dep., ECF No. 116 at Ex. 1, p. 22; ECF No. 113, at Ex. 18.) As part of the application process, LED submitted to the SBA the sworn 8(a) Application Narrative, representing to the SBA that LED is wholly owned by LCDC. (ECF No. 5, at Ex. A.) The federal regulations implementing the 8(a) Program provide that an 8(a) Program participant's "management and daily business operations must be conducted by . . . Community Development Corporations (CDCs)." 13 C.F.R. § 124.106. The regulations further provide that "[c]oncerns owned at least 51 percent by CDCs (or a wholly owned business entity of a CDC) are eligible for participation in the 8(a) [ ]

program and other federal programs requiring SBA to determine social and economic disadvantage as a condition of eligibility . . . [a] concern that is at least 51 percent owned by a CDC (or a wholly owned business entity of a CDC) is considered to be controlled by such CDC and eligible for participation in the 8(a) [ ] program." 13 C.F.R. § 124.111(a)–(b).

11. LED's participation in the 8(a) Program provided LED with preferential treatment and benefits with respect to obtaining governmental contracts. (Lowry Aff., ECF No. 113, at Ex. A, ¶ 9.) The 8(a) Program lasts nine years and as time progresses, 8(a) Program participants must show that the "percentage of government preference contracts over total contracts (including contracts not based on 8(a) preference) is decreasing to certain benchmarks and this is measured by the 'BAT'[2] scores." (Lowry Aff., ECF No. 113 at Ex. A, ¶ 9.)

12. In early 2018, LCDC made a shareholder request to LED for a dividend disbursement of $150,000 to LCDC and LRDA. (LRDA June 12, 2018 Meeting Minutes, ECF No. 113 at Ex. 6, p. 2.) The LED Board refused to make the full disbursement. (*Id.*)

13. On June 2, 2018, the LRDA Board held a special called meeting. (LRDA June 2, 2018 Meeting Minutes, ECF No. 116 at Ex. 1, Ex. 3.) During that meeting, the LRDA and LCDC Boards engaged in discussions regarding operational issues with LED and LED's ability to continue in the 8(a) Program. (*Id.*) Pursuant to

---

[2] Business Activity Scores or "BAT Scores" are evidently an 8(a) Program participants' means of demonstrating levels of achievement on Annual Review Reports submitted to the SBA. (*See* ECF No. 101, at Ex. A-5; ECF No. 116 at Ex. 1, Ex. 3.)

LRDA's purported authority under the LRDA Bylaws to remove a subsidiary board[3], the LRDA Board directed the LCDC Board to dissolve the LED Board. (*Id.*)

14.     Later, on June 2, 2018, the LCDC Board held a special called meeting of its own. (LCDC June 2, 2018 Meeting Minutes, ECF No. 116 at Ex. 1, Ex. 4.) During that meeting, the LCDC Board dissolved the LED Board, which at that time was comprised of three directors: Dinah L. Butcher ("Butcher"), Billy D. Locklear ("Locklear"), and William Lowry ("Lowry"). (*Id.*; ECF No. 5, at .pdf p. 35; LCDC June 25, 2018 Meeting Minutes, ECF No. 116 at Ex. 1, Ex. 8.)

15.     The LCDC Board further directed Dial, as chairman of the LCDC Board, to take "any official action needed with Lumbee Bank and any other banks to keep [LED] fiscally operational during this interim period of restructuring and transition." (ECF No. 116 at Ex. 1, Ex. 4.) The LCDC Board authorized Dial and Hardin to be added to all LED bank accounts as a signatory. (*Id.*) On June 4, 2018, Dial and Hardin went to Lumbee Guaranty Bank (the "Bank") to have Hardin's name added to LED's bank account; the Bank, in turn, refused Hardin's request and froze LED's accounts. (Dial Dep., ECF No. 116 at Ex. 1, p. 27.)

16.     On June 19, 2018, the SBA issued a Notice of Intent to Terminate LED from the 8(a) Program. ("First Notice of Intent to Terminate," ECF No. 116 at Ex. 1, Ex. 18; ECF No. 113, at Ex. 18.) In the First Notice of Intent to Terminate, the SBA

---

[3] The provision relied on by the LRDA Board provides that the LRDA Board has "authority to appoint a general governing Board of Directors of up to 10 members to govern any or all . . . projects. Said Board of Directors shall serve at the pleasure of the LRDA Board of Directors." (ECF No. 106 at Ex.1, Art. II § 6.)

stated that it had recently become aware that LED had issued stock certificates for LED purporting to place ownership of LED in the hands of individual shareholders rather than in LCDC,[4] which contradicted the ownership of LED as represented to the SBA in the 8(a) Application Narrative. (*Id.*) The SBA stated: "SBA believes stock issued to [LCDC], upon whom 8(a) [Program] eligibility is based, is no longer held by LCDC, but rather by individuals." (*Id.*) The SBA also raised concerns with LCDC's dissolution of the LED Board and sought clarification on how LED was controlled at that time. (*Id.*) The SBA gave LED thirty (30) days to explain why the SBA should not move forward with the termination. (*Id.*)

17. On June 25, 2018, the LCDC Board held another special called meeting. (LCDC June 25, 2018 Meeting Minutes, ECF No. 116 at Ex. 1, Ex. 8.) After some discussion, a motion was made to rescind LCDC's June 2, 2018, action of dissolving the LED Board. (*Id.*) As a result, Lowry, Butcher, and Locklear were reinstated to the LED Board. Additionally, on June 27, 2018, the Bank unfroze LED's accounts.

18. On July 16, 2018, LED's Board and the LED Shareholder Representatives declared the share transfers referenced in the First Notice of Intent to Terminate null and void *ab initio* and ratified LCDC's status as the sole shareholder of LED. (ECF No. 5, at .pdf pp. 36–38.) On July 18, 2018, LED's counsel sent a letter to the SBA informing them that LCDC's actions in dissolving the LED Board had been rescinded and that the share certificates had unequivocally been

---

[4] Unbeknownst to the SBA, the stock certificates in LED apparently were issued to individuals between 2010–2013. (ECF No. 5, at ¶¶ 42–44; Voided Stock Certificates, ECF No. 5 at Ex. E.)

voided by the LED Board and the LED Shareholder Representatives. ("SBA Satisfaction Letter," ECF No. 5, at .pdf pp. 28–31.) In the SBA Satisfaction Letter, LED's counsel also proposed that LCDC and LED enter into a written Memorandum of Understanding ("MOU") encompassing the following agreements, *inter alia,* about control of LED moving forward:

1. No amendments to LED's Bylaws shall be undertaken without the prior, written consent of the SBA;

2. Neither LED's Board of Directors nor its officers shall undertake any act not strictly in accordance with LED's Bylaws;

3. LCDC, as LED's sole shareholder, shall undertake no act not strictly in accordance with LED's Bylaws;

4. No LED share transfers shall be undertaken without the prior, written consent of the SBA;

. . .

7. LED shall not be required to share any of its corporate financial information with third parties (including, but not limited to, LRDA) without the express authorization of the LED Board.

(ECF No. 5, at .pdf pp. 30–31.) There is no competent evidence in the record that the SBA required the MOU as a condition of rescinding the First Notice of Intent to Terminate.

19. The parties have not placed in the record any written communication from SBA withdrawing the First Notice of Intent to Terminate. Nevertheless, it is undisputed that the SBA withdrew the First Notice of Intent to Terminate on July 24, 2018. (ECF No. 111, at p. 8; ECF No. 113, at p. 6.) Thereafter, on August 7, 2018,

the LED Board, LED Shareholder Representatives, and LCDC Board convened to discuss the MOU. (LCDC and LED Aug. 7, 2018 Meeting Minutes, ECF No. 116 at Ex. 1, Ex. 9.) After making minor revisions, there was a unanimous vote to authorize the execution of the MOU. (*Id.*) The MOU was executed on August 7, 2018, by a representative on behalf of LCDC and a representative on behalf of LED. ("MOU," ECF No. 116 at Ex. 1, Ex. 10.) The MOU contains the following agreements:

1. No amendments or modifications to LED's Bylaws and/or Articles of Incorporation, whether formal or informal, explicit or implicit, shall be undertaken without the prior, written consent of the SBA;

2. Neither LED's Board of Directors nor its officers shall undertake any act not strictly in accordance with LED's Bylaws;

3. LCDC, as LED's sole shareholder, shall undertake no act, either directly or indirectly, not strictly in accordance with LED's Bylaws;

4. No LED share transfers shall be undertaken without the prior, written consent of the SBA;

5. LCDC, as LED's sole shareholder, shall disavow any right, title and interest that LRDA or any person or entity affiliated therewith might otherwise have or claim with respect to the ownership or control of LED or with respect to any of LED's assets, including, but not limited to, the disavowal of any claim to the right to hire and fire LED employees, to require LED to participate in financial audits of LRDA or of any other third party, to pay monies to LRDA or to any other third party, to lease properties from LRDA or from any third party or, to participate in employee health insurance or benefit programs with LRDA or with any third party;

6. LCDC, as LED's sole shareholder, shall not undertake to override the will of current LED's Board of Directors with respect to the management and disposition of any

> > of LED's assets without the prior, written consent of the SBA;
>
> 7. LED shall not be required to share any of its corporate financial information with third parties (including, but not limited to, LRDA) without the express authorization of the LED Board[.]

(*Id.*) In addition, the MOU contained the following provision that was not one of the terms proposed to the SBA in the SBA Satisfaction Letter:

> 8. Neither LCDC nor any agent thereof shall interfere with the day-to-day business operations of LED or with the reasonable business judgment of LED's Board of Directors and/or LED's officers and managers.

(*Id.*)

20. On August 10, 2018, LED sent the SBA the executed MOU. (ECF No. 5 at Ex. F.) The LRDA Board reviewed the MOU for the first time on August 14, 2018. (LRDA Aug. 14, 2018 Meeting Minutes, ECF No. 113 at Ex. 11, p. 2.) Upon reviewing the MOU, there was "some heated discussion centered on the authority of LCDC to sign such an MOU without LRDA [B]oard involvement." (*Id.*) The LRDA Board proceeded to remove Lowry from the LCDC and LED Boards and appoint a new director, Earl Cummings ("Cummings"), to the LCDC Board. (*Id.* at p. 3.) The LRDA Board also directed the LCDC Board, consistent with the LCDC Bylaws, to appoint Cummings to the LED Board. (*Id.*)

21. On September 11, 2018, the LRDA Board, under authority purportedly bestowed up it by the LRDA Bylaws, removed the entire LCDC Board and replaced the LCDC Board with directors of LRDA's choosing. (LRDA Sept. 11, 2018 Meeting Minutes, ECF No. 106 at Ex. F, pp. 2–3.) On October 8, 2018, the newly constituted

LCDC Board unilaterally rescinded the MOU and appointed Cummings and two additional new members to the LED Board, bringing the total number of directors on the LED Board to five.  (LCDC Oct. 8, 2018 Meeting Minutes, ECF No 106 at Ex. 9.)

22.     In response, LED initiated this action on October 15, 2018 by filing its Petition for Declaratory Judgment.  (ECF No. 5.)  LED alleges that LRDA has, and continues to, interfere in the operations of LED, and is attempting to unlawfully exercise control over LED.  (*Id*. at *passim*.)  In the Petition, LED seeks the following declarations: "[t]hat [LED] is not a subsidiary of Respondent LRDA within the meaning of Chapter 55 of the North Carolina General Statutes; [t]hat Respondent LRDA has no right to control, directly or indirectly, [LED] whatsoever; [t]hat the MOU is a valid and enforceable contract between [LED] and Respondent LCDC; and [t]hat Respondent LCDC cannot unilaterally terminate the MOU."  (ECF No. 5, at p. 16.)

23.     On October 15, 2018, this case was designated to the North Carolina Business Court, and assigned to the undersigned on October 16, 2020.  (Designation Order, ECF No. 1; Assignment Order, ECF No. 2.)  On December 21, 2018, LRDA filed an answer to the Petition.  (LRDA Answer, ECF No. 29.)  On the same day, LCDC filed an answer to the Petition and asserted a counterclaim for conversion against LED.[5]  (LCDC Answer & CC, ECF No. 30.)  On January 4, 2019, LCDC filed

---

[5] In the Motion, LED moves for summary judgment on LCDC's conversion counterclaim. (ECF No. 111, at pp. 27–29.)  LCDC did not respond to LED's arguments regarding LCDC's conversion counterclaim (*see* ECF No. 113), and at the hearing on the Motion, LCDC confirmed that its counterclaim has been abandoned.  Therefore, to the extent LED's Motion seeks summary judgment on LCDC's counterclaim for conversion, LED's Motion should be GRANTED.

an amended answer. (LCDC Amend. Answer, ECF No. 34.) On January 14, 2019, LED filed a reply to LCDC's counterclaim. (Reply to CC, ECF No. 38.)

24. On May 15, 2019, the SBA sent LED a second Notice of Intent to Terminate. ("Second Notice of Intent to Terminate," ECF No. 113, at Ex. 1.) The Second Notice of Intent to Terminate contains the following language:

> LED provided a copy of the executed MOU, dated August 7, 2018, to the SBA North Carolina District Office on August 10, 2018. . . . The MOU incorporates all [of the terms referenced in the SBA Satisfaction letter discussed *supra*] (collectively, the MOU Terms), and further includes the following MOU Term:
>
> > 8. Neither LCDC nor any agent thereof shall interfere with the day-to-day business operations of LED or with the reasonable business judgment of LED's Board of Directors and/or LED's officers and managers.
>
> SBA understands that the validity of the MOU is directly at issue in pending litigation between LED and LCDC. Specifically, LED is seeking, *inter alia,* the North Carolina Superior Court's judgment as to whether the MOU is enforceable as between LED and LCDC, and whether LCDC has the authority to unilaterally terminate the MOU. [ ]
>
> As further discussed below, the SBA has determined that the MOU ostensibly eliminates or unduly restricts LCDC's ability to control LED in violation of SBA regulations. That LED is seeking to enforce it not only demonstrates a fundamental misunderstanding as to the basis of the firm's 8(a) [Program] participation, but also raises significant eligibility concerns. As such, SBA is initiating termination proceedings against LED.

(ECF No. 113 at Ex. 1, p. 2.)

25.    The Second Notice of Intent to Terminate also states that LCDC must have control of LED.  The SBA concluded that the "MOU Term 8 unequivocally restricts LCDC's ability to control LED's day-to-day management; Terms 1, 4, and 6 impose unnecessary and burdensome SBA approval requirements for corporate actions that should otherwise be under LCDC's control."  (*Id.* at p. 3.) The Second Notice of Intent to Terminate afforded LED thirty days to provide a written response detailing why LED's 8(a) Program status should not be terminated.  (*Id.*)

26.    On June 21, 2019, LCDC amended the LCDC Bylaws.  The LCDC Board deleted the existing language of Art. VII § II[6] and replaced it with the following: "The Corporation (LCDC) will be responsible for the appointment of members of the Board of Directors to any such related for profit Corporation."  (ECF No. 101 at Ex. A-5.)  On July 25, 2019, the LED Shareholder Representatives, on behalf of LCDC, declined to extend the LED Board Members, Locklear, Lowry, and Butcher's, terms and elected new members to the LED Board.  (ECF No. 101 at Ex. A-6, Ex. A.)

27.    On November 13, 2019, LCDC filed a Motion to Show Authority along with supporting evidentiary materials and a brief in support of the Motion.  ("Motion to Show Authority," ECF No. 101; Evidence in Supp. ECF No. 101 at Exs. a–h; Br. in

---

[6] Art. VII § II of the LCDC Bylaws formerly stated: "The Corporation will be responsible for the appointment, subject to the concurrence of the related for profit's Board of Directors, for the selection and appointment of the members of the Board of Directors to any such related for profit Corporation."  (ECF No. 116 at Ex. 1, Ex. 2, Art. VII § II.)

Supp., ECF No. 102.) On December 3, 2019, Petitioner filed a brief in opposition to the Motion along with evidentiary materials. (Br. in Opp. ECF No. 106; Evidence in Opp., ECF No. 106, at Exs. 1–14.) On January 14, 2020, the Court issued its order denying the Motion to Show Authority. (Order on Mot. to Show Auth., ECF No. 109.)

28. On December 5, 2019, the SBA sent LED a Notice of Suspension suspending LED from further participation in the 8(a) Program. ("Notice of Suspension," ECF No. 113, at Ex. A-1.) The Notice of Suspension provided, in relevant part, as follows:

> [S]uspension of LED's 8(a) program participation is necessary to protect the interests of the Federal Government. For the reasons outlined in the May 8, 2019 [Second Notice] of Intent to Terminate, . . ., sufficient information exists showing a clear lack of LED's program eligibility. To this end, LED is presently seeking to enforce an executed MOU which – if given effect – unequivocally undermines the basis for LED's 8(a) program eligibility. . .
>
> This suspension is effective as of the date of issuance of this notice and nationally throughout SBA offices. The suspension will continue pending completion of a final program termination determination. LED's program term will only resume if the suspension is lifted or the firm is not terminated.

(*Id*. at pp. 1–2.) The Notice of Suspension also advised LED of its right to appeal the suspension. There is no evidence in the record that LED appealed the suspension.

29. On January 15, 2020, LED filed the Motion along with a Brief in Support of Summary Judgment and evidentiary materials. (ECF No. 110; Br. in Supp., ECF No. 111; LED Eviden. Materials, ECF No. 111, Exs. 1–8.) On February 14, 2020, LCDC filed a Brief in Opposition to [LED's] Motion along with multiple evidentiary

materials. (LCDC Br. in Opp., ECF No. 113; LCDC Eviden. Materials, ECF No. 113, Exs. A, A-1, 1, B, 6, 11, 12, 18.) LCDC also filed an objection to LED's reliance on portions of the Affidavit of Brad Harris in LED's Motion for Summary Judgment. (Objection to Aff., ECF No. 114.)

30.     On February 14, 2020, LRDA filed its Response in Opposition to [LED's] Motion for Summary Judgment and an objection to the use of the Affidavit of Brad Harris, along with multiple evidentiary materials. (ECF No. 116; LRDA Eviden. Materials, ECF No. 116 at Exs. 1–9.) On February 21, 2020, LED filed its Reply Brief in Support of Summary Judgment and Response to Objection to Affidavit of Brad Harris[7]. (ECF No. 117.)

31.     On March 4, 2020 the Court heard oral argument on the Motion. The Motion is now ripe for decision.

## II.    ANALYSIS

### A. Standard of Review

32.     "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law.'" *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (quoting N.C.G.S.

---

[7] The Court, in ruling on the Motion, does not rely on any testimony contained in the Affidavit of Brad Harris. Accordingly, the Court need not address the arguments raised by Respondents' Objection to the use of the Affidavit of Brad Harris or LED's arguments in response to Respondent's objection. Therefore, Respondent's Objection should be DENIED as MOOT.

§ 1A-1, Rule 56(c) (hereinafter the N.C. Rules of Civil Procedure are referred to as "Rules")). The moving party bears the burden of presenting evidence which shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563, 668 S.E.2d 349, 351 (2008). An issue is "material" if "resolution of the issue is so essential that the party against whom it is resolved may not prevail." *McNair v. Boyette*, 282 N.C. 230, 235, 192 S.E.2d 457, 460 (1972). "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000).

33. Once the movant presents evidence in support of his motion, the nonmovant "cannot rely on the allegations or denials set forth in her pleading [ ] and must, instead, forecast evidence to show the existence of a genuine issue of material fact in order to preclude an award of summary judgment." *Steele v. Bowden*, 238 N.C. App. 566, 577, 768 S.E.2d 47, 57 (2014) (internal citations and quotations omitted). In conducting its analysis, the Court must view the evidence in the light most favorable to the nonmovant. *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835. "Summary judgment, when appropriate, may be rendered against the moving party." N.C.G.S. § 1A-1, Rule 56(c); *Elliott v. Enka-Candler Fire & Rescue Dep't, Inc.*, 213 N.C. App. 160, 170, 713 S.E.2d 132, 139–40 (2011) (noting that Rule 56(c) allows the trial court to grant summary judgment to the nonmoving party).

34. Summary judgment may be granted on a claim for declaratory judgment if there remain no issues of material fact and either party

is entitled to relief as a matter of law. *Smith v. Marez*, 217 N.C. App. 267, 270, 719 S.E.2d 226, 229 (2011) (internal citation omitted).

## B. The Court's Discretionary Authority Under the Declaratory Judgment Act

35. The only relief sought by LED in this action is declaratory relief under the North Carolina Declaratory Judgment Act. LED seeks summary judgment on each of the declarations sought in its Petition as follows:

1. That LED is not a subsidiary of Respondent LRDA within the meaning of Chapter 55 of the North Carolina General Statutes ("First Declaration");

2. That Respondent LRDA has no right to control, directly or indirectly, LED whatsoever ("Second Declaration");

3. That the MOU is a valid and enforceable contract between LED and Respondent LCDC ("Third Declaration"); and

4. That Respondent LCDC cannot unilaterally terminate the MOU ("Fourth Declaration").

(ECF No. 110; ECF No. 5, at p. 16.)

36. Under North Carolina law, a declaratory judgment is a statutory remedy that grants a court the authority to "declare rights, status, and other legal relations" when an "actual controversy" exists between parties to a lawsuit. N.C.G.S. § 1-253; *Pine Knoll Shores v. Carolina Water Serv., Inc.*, 128 N.C. App. 321, 321–22, 494 S.E.2d 618, 618 (1998). The Declaratory Judgment Act, by its nature, is best served if trial courts are granted discretion at the outset "because facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly with their grasp." *Coca-Cola Bottling Co. Consol. v.*

*Durham Coca-Cola Bottling Co.,* 141 N.C. App. 569, 578, 541 S.E.2d 157, 163 (2000) (citation and quotation marks omitted).

37.     N.C.G.S. § 1-257 provides trial courts with broad discretion "to decline a request for declaratory relief when (1) the requested declaration will serve no useful purpose in clarifying or settling the legal relations at issue; or (2) the requested declaration will not terminate or afford relief from the uncertainty, insecurity, or controversy giving rise to the proceeding." *Augur v. Augur,* 356 N.C. 582, 588–89, 573 S.E.2d 125, 130 (2002).  "These two fundamental principles require . . . consideration of whether the declaratory proceeding will settle the entire underlying controversy.  The declaratory remedy should not be invoked 'to try a controversy by piecemeal, or to try particular issues without settling the entire controversy.'" *Coca-Cola Bottling Co. Consol.,* 141 N.C. App. at 578, 541 S.E.2d at 163 (citation omitted).  Moreover, declaratory judgments should not be made "without definite concrete application to a particular state of facts which the court can by the declaration control and relieve and thereby settle the controversy." *Augur,* 356 N.C. at 588, 573 S.E.2d at 130 (citation omitted).

### C. The Requested Declaratory Relief Will Serve No Useful Purpose Because LED Has Been Suspended from the SBA 8(a) Program

38.     Preliminarily, the Court concludes that the primary purpose for the declarations—preservation of LED's status as an 8(a) Program participant—cannot now be served by issuance of the declarations.  The Petition was filed on October 15, 2018, shortly after the SBA revoked its First Notice of Intent to Terminate LED from the 8(a) Program.  The declarations sought by LED in this case were aimed at

establishing the rights and legal relationships between LED and LRDA for the purpose of protecting and preserving LED's status as an entity qualified to participate in the SBA 8(a) Program.[8] That purpose was mooted by the SBA's suspension of LED from the 8(a) Program in December, 2019.[9] In fact, the suspension resulted from LED and LCDC entering into the MOU about which LED now seeks to enforce through the Third and Fourth Declarations. (ECF No. 113 at A-1, pp. 1–2; "LED and LCDC have executed a Memorandum of Understanding (MOU) which eliminates or unduly restricts LCDC's ability to control LED in violation of 13 C.F.R. § 124.111(b) . . . LED is presently seeking to enforce an executed MOU which – if given effect – unequivocally undermines the basis for LED's 8(a) program eligibility."). LED does not contend that the Court issuing the requested declaration would have any impact on its termination from the 8(a) Program. Therefore, the Court concludes, in its discretion, that issuance of the declarations would "serve no useful purpose" and would "not terminate or afford relief from the uncertainty, insecurity, or controversy giving rise to the proceeding." *Augur*, 356 N.C. at 588–89, 573 S.E.2d at 130.

---

[8] In fact, in the Petition LED included a request for injunctive relief based, in part, on the contention that "[LED] stands an immediate threat of irreparable harm in that [LRDA's] actions are highly likely to lead to a renewal by SBA of its intent to terminate [LED] from the 8(a) Program." (ECF No. 5, at ¶ 72.)

[9] There is no evidence in the record that LED appealed the Notice of Suspension in accordance with 13 C.F.R. § 305(c).

## D. The Requested Declaratory Relief Will Not Terminate or Afford Relief From The Uncertainty Or Controversy Between the Parties.

39. In addition, the Court concludes, in its discretion, that issuing the declarations would not settle the ultimate controversy between the parties regarding LRDA's "right" to control LED. LED seeks the First and Second Declarations based on the following contention, which is succinctly stated in its brief in support of the Motion: "[p]remised on the clear fact that LED simply is not a subsidiary of LRDA the logical corollary is that LRDA has no right to control any of LED's affairs." (ECF No. 111, at p. 19.) In other words, LED views the First and Second Declarations as interrelated, and believes that if LED is not the corporate subsidiary of LRDA, then LRDA has no "right to control, directly or indirectly, LED whatsoever." (ECF No. 110; ECF No. 5, at p. 16.)

40. LRDA's right to exert control over LED, however, is not determined solely by whether LED is LRDA's subsidiary. Instead, while the evidence in the record supports LED's contention that it is not a corporate subsidiary of LRDA [10] (*see, e.g.*, Dial Dep., ECF No. 111 at Ex. 3, pp. 22–23; LRDA Resp. to Req. for Admission, ECF No 111 at Ex. 2, p. 2; LED Bylaws, ECF No. 34 at Ex. C, Art. I, § 4), the evidence also shows that LRDA has certain rights that provide it with the ability to exert significant influence, and indirect control, over LED by virtue of its power to appoint

---

[10] The Court is unable to locate North Carolina appellate authority that provides a definition of "subsidiary." Black's Law Dictionary defines "subsidiary corporation" as "[a] corporation in which a parent corporation has a controlling share." Black's Law Dictionary (11th ed. 2019). Under the definition provided by Black's Law Dictionary, LED is not a subsidiary of LRDA.

LCDC Board members (ECF No. 116 at Ex. 1, Ex. 2, Art. III, § III), through LRDA Board members who also serve as LED Shareholder Representatives (*see generally* Dial Dep., ECF No. 116 at Ex.1, p. 21), and by virtue of the fact that the three organizations have common Board members (Dial Dep., ECF No. 116 at Ex. 1, pp. 8, 20–21; Hardin Dep., ECF No. 111 at Ex. 4, pp. 69–70). Therefore, while there is evidence upon which a fact finder could conclude that LED is not LRDA's subsidiary, the evidence does not support entry of the Second Declaration. The Court concludes that entering the First Declaration but not the Second Declaration would, at best, settle "particular issues [between the parties] without settling the entire controversy[,]" regarding LRDA's right to control LED, *Coca-Cola Bottling Co. Consol.*, 141 N.C. App. 569 at 578, 541 S.E.2d at 163, and would only cause additional confusion and uncertainty regarding the relations between LED and LRDA.

41. Similarly, for its Third and Fourth Declarations, LED asks the Court to declare that the MOU is a valid and enforceable contract between LED and LCDC and that LCDC cannot unilaterally terminate the MOU. LED maintains that the MOU was necessary to ensure LED's continued 8(a) Program participation, but it is now clear the MOU is the reason LED has lost its 8(a) Program status. In addition, the Court's review of the evidence and the parties' arguments reveals that there are issues of fact as to whether LCDC received consideration in the MOU. These issues of fact preclude the Court from entering the Third Declaration at the summary judgment stage and declaring that the MOU is enforceable. Consequently, the Court cannot enter the Fourth Declaration and declare that LCDC cannot terminate the

MOU. Again, the Court concludes, in its discretion, that no useful purpose would be served by further considering and ruling on the Third and Fourth Declarations under the facts of this case.

## III. CONCLUSION

42. In summary, the underlying purpose in seeking the declarations has been frustrated by LED's suspension from the SBA 8(a) Program. In addition, this matter involves a dispute between three highly integrated and interrelated corporations over control of LED. LRDA formed LCDC and was instrumental in the formation of LED, and the evidence shows that LRDA exercises certain indirect control over LED by virtue of its power to appoint LCDC Board members, through LRDA Board members who also serve as LED Shareholder Representatives, and the fact that the three organizations have common Board members. Given the historical relationship between LRDA, LCDC, and LED and their shared purpose in serving the needs of the local Native American community, it would likely be unwise to attempt to divorce LRDA from having any role in shaping LED's operations.

43. Accordingly, in its discretion, the Court concludes that issuing the declarations sought in this action would serve no useful purpose in settling the legal relations at issue and will not afford relief from the uncertainty or controversy giving rise to this action. The Motion should be DENIED, and pursuant to Rule 56(c), summary judgment should be GRANTED in favor of LRDA and LCDC, and LED's claims should be DISMISSED.

THEREFORE, it is ORDERD that:

1. To the extent the Motion seeks judgment in LED's favor on LCDC's counterclaim for conversion, the Motion is GRANTED;

2. Except as specifically granted, the Motion is DENIED;

3. Pursuant to Rule 56(c), summary judgment is GRANTED in favor of LRDA and LCDC, and LED's claims for declaratory relief are DISMISSED.

4. Any request for taxation of costs by Respondents will be addressed by a separate order.


SO ORDERED, this the 8th day of May, 2020.


/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
for Complex Business Cases